STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. WILLIAM LEROY CLARK, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 11, 1988—Decided August 1, 1988.

Before Judges KING, GAULKIN and D'ANNUNZIO.

*James J. Gerrow, Jr.,* Assistant Prosecutor, argued the cause for appellant (*Stephen G. Raymond,* Burlington County Prosecutor, attorney; *Terrie–Anne Duda,* Assistant Prosecutor, on the brief).

*Robert Seelenfreund,* Assistant Deputy Public Defender, argued the cause for respondent (*Alfred A. Slocum,* Public Defender of New Jersey, attorney).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for *amicus curiae* State of New Jersey (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

KING, P.J.A.D.

This case involves the manner with which defendant was charged with recklessly causing two deaths, *N.J.S.A.* 2C:11–5a, and one serious bodily injury, *N.J.S.A.* 2C:12–1c, in a motor vehicle accident. An indictment was returned in Burlington County in three counts charging defendant with committing these offenses on September 18, 1986: Count One—recklessly causing the death of Harry Applegate; Count Two—recklessly causing the death of Gordon Woodward; Count Three—recklessly causing serious bodily injury to James Hall.

On defendant's motion the Law Division judge dismissed the indictment without prejudice on the authority of *State v. Pennsylvania Railroad Co.*, 9 *N.J.* 194 (1952), stating that the "indictment improperly fractionalizes a single offense and therefore cannot be used to bring him to trial." The State has appealed. We disagree with the dismissal and reverse.

This is the way the State contends that the accident happened. The New Jersey Turnpike (NJT) near milepost 41.2 in Westhampton Township, Burlington County is three lanes wide in each direction. On September 18, 1986 at about 2 p.m. the road conditions were dry and clear. At that time, the southbound Turnpike was undergoing maintenance work and the right-hand lane was closed for line painting. Two vehicles and a number of workers were involved in the maintenance project. An NJT dump-truck and an NJT pick-up truck were in the right-hand land travelling at about 10 to 15 miles per hour about 30 to 40 feet apart. The speed limit on the southbound NJT had been reduced to 45 miles per hour in the area because of the maintenance work.

Trooper O'Donnell of the New Jersey State Police conducted an investigation of the accident and concluded that it occurred in the following manner. The NJT pick-up truck was the lead truck travelling south in the right hand lane. A modified platform had been attached to the tailgate of the pick-up which enabled the passenger, Gordon Woodward, to remove traffic

cones from the roadway as he stood on the platform. The NJT dump-truck, traveling behind the pick-up truck, was towing a single axle "traffic director" with a sign board measuring four-feet by eight-feet standing nine-feet six-inches above the roadway. The signboard had twenty five amber lights, each with a diameter of five and one-eighth inches. Ten of the twenty-five lights were utilized to illuminate a left arrow symbol indicating that the right lane was closed ahead.

The defendant was driving a 1982 Budd tractor-trailer southbound in the center lane. Defendant's truck suddenly pulled into the right lane and struck the left rear of the dump-truck and sign board with its right front. The NJT dump-truck's sign-board platform crumbled to the ground causing indentations in the center of the right lane, marking the point of impact. The dump-truck came to rest against the guardrail, 86 feet south of the point of impact.

Defendant's tractor-trailer continued traveling southbound in the right lane and struck the left rear of the modified platform of the NJT pick-up truck where passenger Gordon Woodward was standing. The impact lifted Woodward and the modified platform of the pick-up truck into the center lane, nearly 203 feet from the original point of impact. Defendant's truck continued onto and over the left side of the NJT pick-up truck, crushing the bed forward and the cab inward. The pick-up truck then spun eastward coming to rest on the right shoulder and the right lane.

After colliding with the NJT pick-up truck, defendant's tractor-trailer veered and jack-knifed as it crossed the center and left southbound lanes. It then collided with the center median guardrail and came to rest 312 feet south of the original point of impact with the NJT dump truck.

The driver of the NJT pick-up truck, Harry Applegate, 31 years old, was crushed inside his vehicle, and the passenger, Gordon Woodward, 24 years old, was thrown across the highway. Both men were pronounced dead at the scene. James

Hall, the driver of the NJT dump-truck, was admitted to the Burlington County Memorial Hospital for scalp lacerations and back injuries.

There were several witnesses who gave statements to the State Police investigators. Sharon A. Marshall of Kingsport, Tennessee was operating a tractor-trailer southbound behind the defendant's vehicle. She said she was travelling southbound in the center lane at approximately 58 miles per hour and was reducing her speed for the lane closing ahead in the right lane. She was following the defendant's yellow-cabbed truck. She stated that the dump-truck with the arrow was in the right lane and she was approximately one hundred and fifty feet behind the dump-truck when the defendant's yellow-cabbed truck whipped into the right lane. She said that she could not understand why he did that. The sign was lighted, signs were up, the cones were in place and the arrow truck was lighted. She said she reached for her CB radio in order to yell at him but he had already hit the NJT dump-truck. She stated she had observed the defendant's yellow-cabbed truck for approximately 30 miles and that the defendant had been following other cars and trucks very closely. In her estimation, during her observation period, the defendant was travelling at approximately 65–68 miles per hour. She never saw his brake lights and therefore assumed that he never hit his brakes before striking the NJT dump-truck.

William E. McComb, Sr., of Jacksonville Beach, Florida was operating a 1982 Chevy Minivan on that same afternoon. McComb stated that he was travelling south on the NJT. He had his cruise control on and set at 55 miles per hour until he saw a sign reading "warning workers ahead speed reduced to 45 miles per hour." McComb reduced his speed to 45 miles per hour when he noticed a diesel truck, the defendant's vehicle, passing him at a high rate of speed. McComb then saw a sign signalling traffic to move to the left lane. McComb stated that the defendant's tractor-trailer did not slow down or move to the left lane until after it had struck the two New Jersey State ve-

hicles—one a large sign truck and the other a small pick-up truck. There was a crash and a worker was thrown from the pick-up truck and propelled into the air. McComb explained that he was travelling in the right lane when the defendant's tractor-trailer passed him in the center lane. At that time, the defendant's truck was travelling no more than five feet behind a silver Oldsmobile. Defendant's tractor-trailer then pulled into the right lane; it never slowed nor pulled out of the right lane. McComb observed the blinking signs, cones and signs indicating that the speed limit had been reduced. According to McComb, defendant's vehicle never decelerated.

Robert B. Hauer was assigned to the line-striping detail that day as an assistant foreman. Hauer explained that he had the job of bringing up the rear group of men retrieving the cones behind the line-striping machine. The turnpike workers were in the process of picking up the cones while driving south in the right lane. The first vehicle was a six-man pick-up and the second vehicle was a five-yard dump truck with an arrow board behind it. Hauer indicated that he was driving on the right shoulder of the roadway following the striping operation. He was preparing to send a vehicle in to replace the six-man pick-up, but before he had the chance to tell the man to change the trucks, Hauer observed the defendant's tractor-trailer coming down the right lane. Hauer attempted to hand signal the tractor-trailer to move over to the center lane but it just continued in the same path. He continued to signal the defendant with his hands to move over to the center lane; however, he himself had to move onto the grass area on the right shoulder. Hauer stated that at the time all the amber lights were illuminated and the arrow on the rear of the dump-truck was operational. The defendant's tractor-trailer then passed Hauer and collided with the back of the arrow board and dump-truck.

We decide that under present law the State is not precluded from prosecuting the defendant in a multiple-count indictment for each separate reckless offense resulting in a

homicide or injury. We do not here deal with any double jeopardy or merger concerns. These may be considered and disposed of after conviction, if there is one, and before sentencing. We conclude only that the State may prosecute each alleged offense in a separate count of a multi-count indictment so long as the charges are joined in the same indictment and the defendant is not subjected to multiple trials on charges arising out of the same incident. *See N.J.S.A.* 2C:1–8(a).

We are here concerned only with the statute and rules governing compulsory joinder for multiple offenses arising out of the same conduct or incident. *N.J.S.A.* 2C:1–8, "Method of Prosecution When Conduct Constitutes More Than One Offense," states in subsection b. as to "Limitation on separate trials for multiple offenses," derived from § 1.07 of the *Model Penal Code*,

> Except as provided in subsection c. [power of court to order separate trials] a defendant shall not be subject to separate trials for multiple criminal offenses based on the same conduct or arising from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction and venue of a single court. [*N.J.S.A.* 2C:1–8b].

The mandatory joinder rule, *R.* 3:15–1(b), also forbids subjecting a defendant "to separate trials for multiple criminal offenses based on the same conduct or arising from the same episode." The statute and the rule have, in effect, codified the mandatory joinder practice as described in the *Model Penal Code* and compelled by *State v. Gregory,* 66 *N.J.* 510, 522 (1975) (Sections 1.07(2) and 1.07(3) of the *Model Penal Code* may be considered "in full force and effect in our State"). *See also* I *Model Penal Code and Commentaries* § 1.07 at 101 (ALI 1985). The main objective of the compulsory joinder rule was to limit multiple prosecutions and convictions for what was essentially the same conduct. *Id.* at 104. At the time the Model Penal Code was drafted, consecutive prosecutions for separate offenses resulting from the same conduct were not uncommon. *Ibid.* (*e.g., Hoag v. New Jersey,* 356 *U.S.* 464, 78 *S.Ct.* 829, 2 *L.Ed.*2d 913 (1958), aff'ing 21 *N.J.* 496 (1956); *Ciucci v. Illinois,* 356 *U.S.*

571, 78 *S.Ct.* 839, 2 *L.Ed.*2d 983 (1958); *cf. Ashe v. Swenson,* 397 *U.S.* 436, 90 *S.Ct.* 1189, 25 *L.Ed.*2d 469 (1970)).

We do not find that *State v. Pennsylvania Railroad Co.* compels a different result than the statute and rule contemplate. We find it clear that in enacting the Code, the Legislature abandoned the "transaction" test in favor of a test that focuses on the offense. As the Attorney General points out, "the overwhelming majority of courts have determined that when different victims are involved there are as many offenses as individuals affected." [1]

*Pennsylvania Railroad,* read literally, does not preclude the State from prosecuting a defendant in a single indictment for all the harm caused to victims by a single act. In that case 84 people were killed when a railroad train operated by the defendant company was hurled from a trestle. A grand jury returned 84 separate one-count indictments for manslaughter against the railroad. The prosecutor then sought an order consolidating the indictments for a single trial. The railroad objected unsuccessfully to consolidation. The Appellate Division reversed the order of consolidation, see 9 *N.J.* at 196 holding that the consolidation rule in effect at that time, *R.* 2:5–4, applied only when different offenses are charged in multiple indictments. The Supreme Court affirmed, holding that long-extant New

---

[1]*See, e.g., McKinney v. State,* 511 *So.*2d 220, 223 (Ala.1987); *State v. Dunlop,* 721 *P.*2d 604, 607–608 (Alas.1986); *Kinsey v. State,* 290 *Ark.* 4, 716 *S.W.*2d 188, 190 (1986); *State v. Miranda,* 3 *Ariz.App.* 550, 557, 416 *P.*2d 444, 451 (1966); *Wilkoff v. Superior Court,* 38 *Cal.*3d 345, 351, 696 *P.*2d 134, 139, 211 *Cal.Rptr.* 742, 747 (1985); *State v. Couture,* 194 *Conn.* 530, 482 *A.*2d 300, 319 (1984); *State v. McFadden,* 320 *N.W.*2d 608, 617–618 (Iowa 1982); *Savoy v. State,* 67 *Md.App.* 590, 508 *A.*2d 1002, 1004 (Ct.Sp.App.1985); *cert.* den. 514 *A.*2d 24 (Ct App.1986); *Commonwealth v. Meehan,* 14 *Mass.App.* 1028, 442 *N.E.* 43, 44 (1982); *State v. Irvin,* 603 *S.W.*2d 121, 123–124 (Tenn.1980); *Ex Parte Rathmell,* 717 *S.W.*2d 33, 35–36 (Tex.Crim.App.1986) (*en banc* ); *State v. Myers,* 298 *S.E.*2d 813, 816–817 (W.Va.1982); *State v. Rabe,* 96 *Wis.*2d 48, 291 *N.W.*2d 809, 817–820 (1980); *Vigil v. State,* 563 *P.*2d 1344, 1351 (Wyo.1977); R. Owens, *Alabama's Minority Status: A Single Criminal Act Injuring Multiple Persons Constitutes Only A Single Offense,* 16 *Cum.L.Rev.* 85 (1985–86).

Jersey precedent precluded multiple indictments for crimes arising from a single act. 9 *N.J.* at 198–199. The Court was concerned that a consolidation after indictment would impair defendant's right to assert a double jeopardy bar. *Id.* at 196–198.

As noted, we see no such obstacle to defendant's invocation of the double jeopardy doctrine under our holding. Under *N.J.S.A.* 2C:1–8

Method of Prosecution When Conduct Constitutes More Than One Offense.

a. Prosecution for multiple offense; limitation on convictions. *When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense.* He may not, however, be convicted of more than one offense if:

(1) One offense is included in the other, as defined in subsection d. of this section;

(2) One offense consists only of a conspiracy or other form of preparation to commit the other;

(3) Inconsistent findings of fact are required to establish the commission of the offense; or

(4) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct. The provisions of this paragraph (4) of subsection a. of this section or any other provision of law notwithstanding, no State tax offense defined in Title 54 of the Revised Statutes or Title 54A of the New Jersey Statutes, as amended and supplemented, shall be construed to preclude a prosecution for any offense defined in this code.

*A determination barring multiple convictions shall be made by the court after verdict or finding of guilty.* [Emphasis supplied].

See *Cannel, Title 2C,* Comment *N.J.S.A.* 2C:1–8 at 37; see also *State v. Mills,* 51 *N.J.* 277, 289 (1968), *cert.* den. 393 *U.S.* 186, 89 *S.Ct.* 105, 21 L.Ed.2d 104 (1968); *State v. Currie,* 41 *N.J.* 531, 535–536 (1964); *State v. Roller,* 29 *N.J.* 339 (1959). If *Pennsylvania Railroad* survives the adoption of the criminal code at all, it does not control the case before us.

Death by auto, *N.J.S.A.* 2C:11–5, is one of the forms of criminal homicide. *See State v. Milligan,* 202 *N.J.Super.* 336 (App.Div.1985), aff'd *o.b.* 104 *N.J.* 67 (1986). Criminal homicide occurs when a person purposely, knowingly, recklessly, or under circumstances set forth in *N.J.S.A.* 2C:11–5, causes the death of another human being. *N.J.S.A.* 2C:11–2(a). Criminal

homicide constitutes death by auto when it is caused by driving a vehicle recklessly. *N.J.S.A.* 2C:11–5(a). Assault by auto, *N.J.S.A.* 2C:12–1c, occurs when a person drives a vehicle recklessly and causes either serious bodily injury or bodily injury to another. The Legislature's use of the terms "of another" in these provisions demonstrates that the essence of both offenses is the death of or injury to a human being, not simply the reckless operation of an automobile. *See e.g., Commonwealth v. Meehan,* 14 *Mass.App.* 1028, 442 *N.E.*2d 43, 44 (1982) (legislative duty to define this offense has few limits under double jeopardy clause); *see also State v. Bowens,* 108 *N.J.* 622, 638–639 (1987).

We finally note that in two recent decisions of this court defendants had been indicted on separate counts of the same indictments on multiple charges of homicide or assault. *See State v. Lewis,* 223 *N.J.Super.* 145 (App.Div.1988) (arson resulted in one death and six injuries; defendant indicted on one count of homicide and six counts of assault); *State v. Bogus,* 223 *N.J.Super.* 409 (App.Div.1988) (indictment on two counts of aggravated manslaughter arising from auto accident).

The judgment of the Law Division is reversed and the indictment is reinstated.