257 N.J. Super. 178 (1992)
608 A.2d 364
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
THOMAS W. JOHNSTON, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 1991.
Decided May 29, 1992.
*181 Before Judges MICHELS, O'BRIEN and HAVEY.
Edward A. Jerejian and John P. Dell'Italia argued the cause for appellant (Dell'Italia, Affinito & Jerejian, attorneys, Edward A. Jerejian, of counsel, Edward A. Jerejian, John P. Dell'Italia and Robert S. Miseo, on the brief).
Robert D. Kobin and Joseph Connor, Jr., Assistant Morris County Prosecutors, argued the cause for respondent (W. Michael Murphy, Jr., Morris County Prosecutor, attorney, Joseph Connor, Jr., of counsel and on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
*182 In October 1985, the Morris County Grand Jury indicted defendant Thomas W. Johnston for (1) purposely and/or knowingly murdering Irmgard D. Johnston, his wife, a first degree crime, in violation of N.J.S.A. 2C:11-3a(1) and (2) (Count 1) and (2) knowingly and unlawfully possessing a hammer or bludgeon with a purpose to use it unlawfully against the person or property of another, a third degree crime, in violation of N.J.S.A. 2C:39-4d (Count 2). Mrs. Johnston's body was found by Patrolman William Post of the Montville Township Police Department under a tarpaulin approximately 40 to 50 feet into the woods next to the Johnston home.
Detective Post proceeded back towards the Johnston home, where he noticed a red fiber laying on the driveway. Then, as he was going up the stairs, Detective Post found another red fiber laying imbedded in the wood on the stairway. Detective Post entered the Johnston home, told Investigator Mark Meehan of the Morris County Prosecutor's Office what he had found and that at that point Post had concluded that defendant killed his wife. When Detective Post entered the Johnston home after 15 to 20 minutes outside, defendant was sitting at a little desk with a drawer in the dining room or kitchen. Because of his knowledge that defendant possessed weapons and that no one had searched defendant, Detective Post picked defendant up from where he was sitting, searched him, placed him under arrest, read him his Miranda rights and handcuffed him.
Dr. Ernest Tucker, a forensic pathologist and the Morris County Medical Examiner, conducted an on-site examination of Mrs. Johnston's body. Mrs. Johnston's body was lying face up in a shaded part of a woods covered by a tarpaulin with her feet pointing toward the house. Rigor mortis was well or completely developed and her body was cool. Fly eggs and insect bites were on her body, indicating that it had been there for some time. Mrs. Johnston's lavender shirt and bra had been pulled *183 up around her neck to expose her breasts. Her underpants and white trousers had been pulled down around her hips, exposing her pubic hair. Her shirt was drenched in blood and her pants were partially so. Mrs. Johnston was wearing neither shoes nor stockings.
Dr. Tucker's examination revealed that Mrs. Johnston had eight lacerations of her scalp deep enough to expose the underlying bone. She had a laceration above each eye deep enough to expose the underlying bone of the skull. She had lacerations on her left cheek, two black eyes, 14 to 20 bruises over her body, a bruised upper lip and her hair was full of blood. Mrs. Johnston's skull was fractured in five places, both on top of her skull and the sides, and her left jaw was fractured. In total, Mrs. Johnston's body contained more than 29 different injuries, most of them around the head. The bruises appeared to be chiefly defensive wounds on her arms and palms of her hands, suffered when she had tried to ward off her attacker's blows. Several of Mrs. Johnston's fingernails had been broken off, indicating she had tried to defend herself by scratching her attacker. Her body, face and left hand sustained injuries from the struggle, and she had bled so badly that there was virtually no blood left in her body. Moreover, when Mrs. Johnston was rolled over, there was little or no blood beneath her body. Dr. Tucker was of the opinion that these last two facts indicated that she had been killed elsewhere and that her body had been dragged to the place where it was found. Subsequently, it was determined that Mrs. Johnston had been murdered in the kitchen of her home.
Dr. Tucker opined that Mrs. Johnston's injuries were consistent with a blunt instrument attack, most likely a hammer, because two of her injuries were crescent-shaped, consistent with defense against that weapon. He surmised that Mrs. Johnston had been standing during the attack with the assailant in front of her at least part of the time, but that the fatal blow could have been delivered from behind.
*184 Magnetic Resonance Imaging studies of Mrs. Johnston's head showed that the fatal injury was a depressed skull fracture on the top of her head which had allowed air to be drawn into the cranial cavity and had caused extensive bruising of the underlying brain tissue. Dr. Tucker was of the opinion that the cause of death was multiple skull fractures with injury to the brain.
Approximately one year after indictment, defendant, following plea negotiations, pleaded guilty to aggravated manslaughter in violation of N.J.S.A. 2C:11-4a. The State, for its part of the plea agreement, agreed to a maximum custodial sentence of 20 years with a 10 year period of parole ineligibility, a $100,000 fine, and the dismissal of the possessory offense charged in Count 2. In addition, "the sentencing judge was to `recommend and request' of the Commissioner of Corrections that defendant serve any custodial sentence at the penal facility location in Clinton, New Jersey." Within one week of entering his guilty plea, defendant wrote a letter expressing his dissatisfaction with the disposition, the advice of his then counsel concerning a psychiatrist's preliminary report which seemed to negate defendant's insanity defense. As a result, the trial court temporarily assigned another attorney to assist defendant with an application to withdraw that plea. In November 1986, following a plenary hearing, defendant's motion to withdraw his guilty plea was denied. The trial court found defendant's motion to retract his guilty plea to be "merely a ploy designed to justify [defendant's] change of mind." Thereafter, the sentencing judge committed defendant to the custody of the Commissioner of the Department of Corrections (Commissioner) for 20 years with a 10 year period of parole ineligibility and imposed a $100,000 fine and a $10,000 Violent Crimes Compensation Board (VCCB) penalty. The trial court dismissed the possessory offense charged in Count 2 and recommended that defendant serve his custodial sentence at the Clinton facility. Defendant appealed. In August, 1988, in an unpublished opinion, we vacated defendant's guilty plea and remanded the matter for trial on the original charges based upon the trial court's abuse of discretion *185 in refusing to allow defendant to withdraw his guilty plea. State v. Johnston, A-2055-86T4 (Aug. 25, 1988).
The case was tried in July and August, 1989. On the second day of trial, a Rule 8 hearing was held concerning the admissibility of testimony by defendant's daughter, Kirsten Johnston, concerning three of his prior acts. The trial court held the testimony admissible and relevant with respect to defendant's intent and state of mind. On the third day, the trial court found that the issue of self-defense had been fairly raised as an affirmative defense for defendant, and that the State was entitled to meet the issue. Later, defendant's motion to conduct a Rule 8 hearing of the State's psychiatrist was denied. Finally, at the conclusion of the trial, defendant was found guilty of (1) purposely and knowingly murdering Mrs. Johnston in violation of N.J.S.A. 2C:11-3a(1) and (2) (Count 1) and (2) knowingly and unlawfully possessing a hammer or bludgeon with a purpose to use it unlawfully against the person or property of another, in violation of N.J.S.A. 2C:39-4d (Count 2). The trial court merged defendant's conviction for possession of a hammer with a purpose to use it unlawfully against the person or property of another under Count 2 into his conviction for murder under Count 1 and committed defendant to the custody of the Commissioner for a life term with a 30-year period of parole ineligibility and imposed a $100,000 fine and a $10,000 VCCB penalty. Defendant appeals.
Defendant seeks a reversal of his conviction or, alternatively, a modification of his sentence on the following grounds set forth in his brief:
I. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION TO SUPPRESS TAPE RECORDINGS SEIZED IN VIOLATION OF DEFENDANT'S FOURTH AND FIFTH AMENDMENT RIGHTS.
II. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY INTERPOSING SELF-DEFENSE AS AN AFFIRMATIVE DEFENSE AT TRIAL.
III. THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY ALLOWING DR. TRENT TO TESTIFY WITHOUT CONDUCTING A *186 HEARING AS TO WHETHER OR NOT THE DOCTOR RELIED ON CERTAIN EXPERT REPORTS IN FORMULATING HIS OPINION.
IV. THE TRIAL COURT'S CHARGE WAS DEFICIENT IN ITS FAILURE TO ADDRESS THE PROPER ROLE OF PASSION/PROVOCATION EVIDENCE IN ITS INITIAL CHARGE FOR PURPOSEFUL MURDER.
V. THE COURT ERRED AS TO ITS CHARGE OF INTOXICATION AND DIMINISHED CAPACITY.
VI. DEFENDANT'S SENTENCE WAS EXCESSIVE.
In addition, defendant raises the following issues in his pro se supplemental brief:
JUSTIFICATION FOR REVERSAL:
A. JUDGE SMITH LACKED KNOWLEDGE AND MADE SUBSTANTIAL ERRORS
I. JUDGE SMITH MADE SIGNIFICANT CONTRIBUTIONS TO THE WRONGFUL VERDICT THROUGH HIS LACK OF KNOWLEDGE AND UNDERSTANDING OF PERTINENT LAW.
B. PROSECUTORIAL MISCONDUCT CONTRIBUTED TO A WRONGFUL VERDICT
II. EVIDENCE WAS ILLEGALLY SEIZED, AND EXCULPATORY EVIDENCE WAS EITHER LOST OR DESTROYED BY THE PROSECUTOR, OR BY THOSE TO WHOM HE GRANTED UNAUTHORIZED ACCESS.
III. NEW EVIDENCE HAS BEEN DISCOVERED THAT REFUTES THE PROSECUTOR'S SUCCESSFUL EFFORT TO DISCREDIT TRUTHFUL TESTIMONY.
IV. THE PROSECUTOR MISLED THE JURY THROUGH UNETHICAL MANIPULATION THAT MADE SIGNIFICANT CONTRIBUTIONS TO THE WRONGFUL VERDICT.
C. THE JURY WAS MISLED, CONFUSED, AND RUSHED
V. ONE OF THREE JURORS WHO ATTENDED THE SENTENCING REPORTED THAT THE VERDICT WAS LARGELY BASED ON A LIE FABRICATED BY A WITNESS TO AVOID REVEALING HIS CONTRIBUTION TO THE HOMICIDE.
VI. THE JURORS WERE CONFUSED, WERE DENIED THEIR REQUEST FOR CLARIFICATION, AND THEY PRE-DETERMINED A TIME LIMIT THAT WAS TOO SHORT FOR ADEQUATE DELIBERATION.
We have carefully considered these contentions and all of the arguments advanced in support of them by defendant, through counsel and in his pro se supplemental brief, and with the sole exception of the issue of newly discovered evidence raised under Point III of the pro se supplemental brief (which is not properly before us and which we do not decide), we are satisfied *187 that they are all clearly without merit. R. 2:11-3(e)(2). However, further comment is appropriate with respect to some of these contentions.

I.
Defendant first contends that the trial court erred by denying his motion to suppress certain tapes of telephone recordings, claiming that the seizure, even though with a search warrant, was unreasonable, an invasion of privacy under the Fourth Amendment of both Federal and State constitutions and violated his right against self-incrimination. We disagree. According to the proofs at the suppression hearing, the municipal court issued a search warrant for the Johnston home. The warrant authorized the seizure of:
property consisting of: Rugs, Fibers, Blood, Fingernails, Weapons, and any instrumentalities and evidence related to the death of Irmgard Johnston.
During the search of the Johnston home, Investigator Meehan came upon a tape recorder hooked up to a telephone. He listened to the tape in the machine and it contained telephone conversations, including one with him. Investigator Meehan seized the tapes for further review at a later time. The four tapes played at the pre-trial hearing only contained telephone conversations between defendant and his neighbor Marion DePuy Bushman, defendant and his matrimonial attorney George Johnson, defendant and the victim's secretary at BASF Corporation, Renate Scanlon, defendant and the Montville Police Headquarters, defendant and his mother and/or father, and defendant and the victim. In our view, the seizure of these tapes did not violate defendant's constitutional rights in any respect.
The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. The Fourth Amendment, however, does not forbid all searches and seizures. State v. Bruzzese, 94 N.J. 210, 217, 463 A.2d 320 (1983), cert. denied sub nom., *188 Bruzzese v. New Jersey, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984); State v. Anderson, 198 N.J. Super. 340, 348, 486 A.2d 1311 (App.Div.), certif. denied, 101 N.J. 283, 501 A.2d 946 (1985). "Rather, it only proscribes those that are judicially deemed unreasonable." Anderson, 198 N.J. Super. at 348, 486 A.2d 1311 (citing Bruzzese, 94 N.J. at 217, 463 A.2d 320). "Indeed, the touchstone of the Fourth Amendment is reasonableness." Bruzzese, 94 N.J. at 217, 463 A.2d 320. Fourth Amendment issues are complex and are "peculiarly dependent upon the facts involved. Commonly, such constitutional issues involve no more than a seasoned `value judgment upon a factual complex rather than an evident application of a precise rule of law.'" Anderson, 198 N.J. Super. at 348, 486 A.2d 1311 (citing State v. Funicello, 60 N.J. 60, 72, 286 A.2d 55 (1972) (Weintraub, C.J., concurring)).
"[S]earch warrants are strongly favored under the Federal and State constitutions." State v. Malik, 221 N.J. Super. 114, 118, 534 A.2d 27 (App.Div. 1987). See State v. Bell, 195 N.J. Super. 49, 55, 477 A.2d 1272 (App.Div. 1984). "The warrant requirement is predicated upon the premise that the necessity and reasonableness of a search can best be determined `by a neutral and detached magistrate instead of ... [a police] officer engaged in the often competitive enterprise of ferreting out crime.'" Malik, 221 N.J. Super. at 118, 534 A.2d 27. Our Supreme Court has said:
It is well settled that officers searching a person's home, car or belongings under authority of a search warrant are authorized to use only those investigatory methods, and to search only those places, appropriate in light of the scope of the warrant. Harris v. United States, 331 U.S. 145, 152, 67 S.Ct. 1098, 1102, 91 L.Ed. 1399, 1407 (1947). An analysis of the reasonableness of the methods used in a search, as well as the areas searched, should focus upon whether the search in its totality was consistent with the object of the search. Id. [State v. Reldan, 100 N.J. 187, 195, 495 A.2d 76 (1985)].
Also,
It is true that the Fourth Amendment and Article I, Section 7 of the State Constitution prohibits "general searches and unrestrained seizures by officers acting under the unbridled authority of a general warrant." State v. Muldowney, 60 N.J. 594 [292 A.2d 26] (1972). Although the description of items in a *189 warrant must be sufficiently definite to prevent searches conducted at the whim of an officer, id.; State v. Seefeldt, 51 N.J. 472 [242 A.2d 322] (1968), a warrant granting an officer some discretion in searching for items that fall within a named category is not necessarily invalid. State v. Muldowney, supra, 60 N.J. at 600-01 [292 A.2d 26]. "[T]he description of items to be seized need only be as specific as the circumstances will allow." State v. [Tunnel] Tunnell Citgo Services, 149 N.J. Super. 427, 431 [374 A.2d 32] (App.Div. 1977). In this case, the authority to search for "anything else of evidentiary value ..." must be read in the context of the particular items specified in the warrant and the particular crime that is the occasion for the warrant. United States v. Christine, 687 F.2d 749 (3d Cir.1982); see State v. Bisaccia, 58 N.J. 586 [279 A.2d 675] (1971). Thus viewed, the warrant did not authorize "a general exploratory rummaging in a person's belongings." Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583 (1971). [State v. Reldan, supra, 100 N.J. at 196 n. 2, 495 A.2d 76].
In State v. Reldan, the defendant was a suspect in both a series of unrelated burglaries and murders. A warrant was issued upon the police's application to "search [the] defendant's automobile for criminal evidence relating to the `break and entry * * * including but not limited to, fingerprints, implements used to commit the break and entries, * * * and anything else of evidentiary value that a complete and thorough search might disclose.' (Emphasis added.)" Id. at 196, 495 A.2d 76. Law enforcement officials vacuumed the interior of the defendant's car and found evidence linking him to the murders. Even though none of the items of stolen property would have required a vacuum to retrieve it, the vacuum could have picked up broken particles of jewelry. Id. Our Supreme Court held that the use of a vacuum in executing the warrant did not exceed the scope of the warrant as to either the areas searched or items sought and it was not otherwise unreasonable. Id. at 196-97, 495 A.2d 76.
Here, too, the search warrant authorized seizure of, among other things, "any instrumentalities and evidence related to the death of Irmgard Johnston." Reading that in the context of the items specified in the warrant, to wit, "Rugs, Fibers, Blood, Fingernails, [and] Weapons," and given that a homicide had taken place, it was reasonable and within the scope of the warrant to seize the tapes. At the time of the seizure, the *190 police had probable cause to believe that defendant killed his wife, that defendant and his wife were having marital problems, that there was a heated divorce, and that there were claims of spousal abuse. In addition, Investigator Meehan knew that the tapes in the machine contained current information, since he surmised that the tape recorder was automatically taping telephone calls from hearing his own telephone conversation with defendant. Moreover, the other tapes seized contained conversations which directly related to defendant's intent and motive.
Furthermore, defendant's rights against self-incrimination under the Fifth Amendment and New Jersey common law were not violated. First, under federal Fifth Amendment analysis, defendant was in no way compelled to record, retain, label, restate, repeat or affirm the tapes or their contents. Defendant voluntarily recorded these telephone conversations between himself and third parties, then labeled them and kept them in his desk and the surrounding areas. Defendant testified on his own behalf and was cross-examined regarding the tapes, but was not required to restate, repeat or affirm their contents. See United States v. Doe, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).
Second, under New Jersey common-law principles, defendant's right against self-incrimination was not violated. Defendant's right to a private enclave where he may lead a private life, Matter of Grand Jury Proceedings of Guarino, 104 N.J. 218, 231, 516 A.2d 1063 (1986), has not been violated. The tapes seized were recordings of telephone conversations between defendant and third parties. These are not matters that invoke concerns of personal privacy, e.g., personal comments, telephone numbers, or, as Justice Marshall said, "[d]iaries and personal letters that record only their author's personal thoughts...." Couch v. United States, 409 U.S. 322, 350, 93 *191 S.Ct. 611, 626, 34 L.Ed.2d 548, 566 (1973) (Marshall, J., dissenting). See also Guarino, supra, 104 N.J. at 232 n. 9, 516 A.2d 1063. Moreover, defendant compromised "the requisite element of privacy or confidentiality essential for the privilege to attach," Bellis v. United States, 417 U.S. 85, 92, 94 S.Ct. 2179, 2185, 40 L.Ed.2d 678, 686 (1974), by conversing with third parties. See Guarino, supra, 104 N.J. at 232-33, 516 A.2d 1063.
Beyond this, even if we assume that the trial court erred in not suppressing the tapes, in view of the overwhelming evidence of guilt, the error was harmless. The failure to suppress the tapes was not "clearly capable of producing an unjust result." See R. 2:10-2; State v. Lair, 62 N.J. 388, 392, 301 A.2d 748 (1973). State v. Hock, 54 N.J. 526, 538, 257 A.2d 699 (1969), cert. denied sub nom. Hock v. New Jersey, 399 U.S. 930, 90 S.Ct. 2254, 26 L.Ed.2d 797 (1970). There was no real possibility that the claimed error led the jury to a result that it otherwise might not have reached. See State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).

II.
Defendant also contends that the trial court abused its discretion by imposing self-defense on defendant's case over his objection and that the jury verdict violated "the principle of a hierarchical consideration of possible verdicts" pursuant to State v. Coyle, 119 N.J. 194, 574 A.2d 951 (1990). We are satisfied that the trial court did not mistakenly exercise its discretion by imposing self-defense on defendant's case over his objection. As the State points out, defendant's own statement forced the trial court to impose a self-defense claim. N.J.S.A. 2C:3-4a provides:
Use of force justifiable for protection of the person. Subject to the provisions of this section and of section 2C:3-9, the use of force upon or toward another person is justifiable when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.
*192 N.J.S.A. 2C:3-1a provides, in pertinent part, that "justification is an affirmative defense." To justify the use of force, the actor must reasonably believe that force is immediately necessary. N.J.S.A. 2C:3-4a. See State v. Hipplewith, 33 N.J. 300, 316-17, 164 A.2d 481 (1960).
The affirmative defense of self-defense will not lie unless defendant possesses an actual, honest belief in the necessity of using force. State v. Kelly, 97 N.J. 178, 198, 478 A.2d 364 (1984). See State v. Burks, 208 N.J. Super. 595, 604, 506 A.2d 779 (App.Div. 1986).
Honesty alone, however, does not suffice. A defendant claiming the privilege of self-defense must also establish that her belief in the necessity to use force was reasonable. See, e.g., State v. Mellillo, 77 N.J.L. 505 [71 A. 671] (E. & A. 1908); State v. Mark Len, 108 N.J.L. 439, 440 [158 A. 749] (Sup.Ct. 1932). [Kelly, 97 N.J. at 199, 478 A.2d 364].
It is not imperative that actual necessity exist in order to act in self-defense. Id. at 198, 478 A.2d 364. But, "the privilege of self-defense does not exist where the defendant's action is not prompted by a belief in its necessity...." Id. What is reasonable is not measured by what defendant found reasonable; rather, what is reasonable is measured by an objective standard. State v. Bess, 53 N.J. 10, 16-17, 247 A.2d 669 (1968).
In considering a request to charge a jury on self-defense, the court must examine both the defense's and prosecutor's cases to determine whether any evidence supporting a claim of self-defense was provided during the trial. State v. Abbott, 36 N.J. 63, 72, 174 A.2d 881 (1961). As the Supreme Court noted in Abbott:
There has been some uncertainty in the language of our cases upon the burden of proof with respect to self-defense. The decisions are treated in State v. Chiarello, 69 N.J. Super. 479 [174 A.2d 506] (1961), where the Appellate Division correctly said that although the burden is upon a defendant to adduce evidence to support the defense, yet if such evidence appears either in the State's case or upon the defendant's case, the issue must be left to the jury with this instruction: that the burden is upon the State to prove beyond a reasonable doubt that the defense is untrue, and hence there must be an acquittal if there is a reasonable doubt as to whether defendant did act in self-defense within the definition of that defense. [Id.].
*193 See also State v. Kelly, 97 N.J. at 200, 478 A.2d 364 ("if any evidence raising the issue of self-defense is adduced, either in the State's or the defendant's case, then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts...."); State v. Gardner, 51 N.J. 444, 454, 242 A.2d 1 (1968) ("the `burden of proving' self-defense is not on a defendant. Once proof appears either in the State's case or defendant's case in support of an allegation of self-defense, the State has the burden of proving that the defense is untrue."); State v. Burks, 208 N.J. Super. at 604, 506 A.2d 779 ("if any evidence raising the issue of self-defense is admitted in either the State's or the defendant's case, then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts."); State v. Chiarello, 69 N.J. Super. 479, 498, 174 A.2d 506 (App.Div. 1961), certif. denied, 36 N.J. 301, 177 A.2d 343 (1962) (if evidence of self-defense appears in either the State's or defendant's case, the jury must be instructed that the State has to prove that the self-defense claim does not accord with the facts).
In State v. Powell, 84 N.J. 305, 318-19, 419 A.2d 406 (1980), our Supreme Court imposed an affirmative duty upon the trial court to charge the jury with respect to the lesser included offenses of murder even though no request had been made or a request had been withdrawn for a manslaughter charge where the evidence supports the charge. As accurately stated, in a murder case the trial court has a duty "to charge the applicable law to the jury based upon the facts regardless of what requests counsel may make." Id. at 318, 419 A.2d 406. In so finding, the Court in Powell held:
There is a third party involved (represented by the jury): the State itself, on behalf of its citizens. Their interest is paramount, even more important than preserving the "purity" of the adversary system, especially when there seems to be no justifiable end served by that system in this particular situation. Very simply, where the facts on the record would justify a conviction of a certain charge, the people of this State are entitled to have that charge rendered to the *194 jury, and no one's strategy, or assumed (even real) advantage can take precedence over that public interest. It matters not that the defendant's counsel may be correct in the belief that acquittal is more likely without such charge, or that defendant himself is willing to take that chance; nor does it matter that the prosecutor is content to forego the manslaughter instruction in the hope that a conviction of murder will result. The judge is more than a referee between contestants. He is the law's representative, and it is his duty to see that the will of the law is done. The real function of the adversary system is to help him fulfill that duty. [Id. at 319, 419 A.2d 406].
In State v. Ramseur, 106 N.J. 123, 270 n. 62, 524 A.2d 188 (1987), the Court noted in a footnote that the trial court gave the jury an insanity charge as well as a diminished capacity charge, even though the defense had waived an insanity defense. The Court said:
Although the competing considerations are obvious, they are difficult to reconcile. We accept the proposition that in a murder case the trial court has a duty "to charge the applicable law to the jury based upon facts regardless of what requests counsel may make," State v. Powell, 84 N.J. 305, 318 [419 A.2d 406] (1980) (emphasis in original), based on the belief
that the public interest may require that a particular charge be given to the jury, where the facts rationally support such a charge, even though neither the defense nor the prosecution has requested it; that enforcement of the criminal law is too important to be controlled completely by the contentions of the adversaries; and that the court has an obligation to see to it that the jury, as the representative of the public, is given all of the facts and all of the possible offenses that might reasonably be found from such facts. [State v. Choice, 98 N.J. 295, 298-99, 486 A.2d 833 (1985) (emphasis in original).]
On the other hand, there is considerable force behind the position that a competent defendant may reject the defense of insanity for any number of reasons, see, e.g., State v. Khan, 175 N.J. Super. 72, 81 [417 A.2d 585] (App.Div. 1980) (discussing Whalem v. United States, 346 F.2d 812 (D.C. Cir.), cert. den., 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965), and Frendak v. United States, 408 A.2d 364 (D.C.Ct.App. 1979))  a proposition not confronted directly by Powell and Choice. Moreover,
[w]hile the public interest in giving the jury all of the facts and the option to choose from all of the consequent possible offenses may prevail over counsel's interest ..., that may not be the case where the injection of [unsolicited jury instructions] by the court will enhance the risk of a murder conviction. [State v. Choice, supra, 98 N.J. at 300-01, 486 A.2d 833 (emphasis in original).]
Given the state of the record before us and the absence of any discussion of the issue on appeal, we simply exhort trial courts in capital cases to weigh most carefully the questions raised by a defendant's request to waive a defense. On this record, we will not raise and decide the issue on our own motion. [Id.].
*195 In State v. Khan, 175 N.J. Super. 72, 83, 417 A.2d 585 (App.Div. 1980), we resolved the issue of how to progress when the trial court imposes a defense of insanity over defendant's objection attendant to "the unique circumstances" of the case, stating:
if the [insanity] defense is to be interposed despite defendant's objection, then presenting the defenses of self-defense and insanity at a single trial, with separate counsel as to each, as was directed in the order under review, could result in a fundamentally unfair situation for defendant. One attorney representing defendant would argue that he acted in self-defense, while the other would seek to establish at the same time that the attack never occurred but was a delusion on the part of defendant. Cf. United States v. Taylor, 510 F.2d 1283, 1288 (D.C. Cir. 1975). See, also, Contee v. United States, 410 F.2d 249, 250 (D.C. Cir.1969); Holmes v. United States, 363 F.2d 281 (D.C. Cir. [1966] 1977). In the unique circumstances here present, we think that the issues must be bifurcated at the trial, with the insanity issue to be tried first, particularly since it would have been, in fact, interposed by the trial judge. At the close of the proofs on that issue, it will be submitted to the jury, with appropriate instructions, for a determination of whether defendant was insane at the time the homicide was committed. If the jury finds that he was, then the trial judge would direct the entry of a judgment of acquittal on the ground of insanity and dispose of the case as provided for under N.J.S.A. 2C:4-7. If the jury finds that defendant was not insane at the time the homicide was committed, then the trial would proceed on the general issue of defendant's guilt or innocence of the crimes charged, including the issue of self-defense. [Id. 175 N.J. Super. at 83-84, 417 A.2d 585].
Here, the proofs, including defendant's statements and actions, plainly raised an issue as to self-defense. Defendant's statement to the police that his wife had attacked him and his inculpatory statements all gave rise to a claim of self-defense. Moreover, based on the proofs, the claims of self-defense and insanity/diminished capacity were not totally inconsistent. A reasonable jury, taking both Dr. Latimer's and defendant's testimony together as a whole, could have concluded that defendant was acting in self-defense when Mrs. Johnston approached him with the knife. According to defendant, he tried to knock the knife out of his wife's hand with the hammer, but when his wife continued to attack he, in effect, allegedly lost control and blacked out. The trial court, therefore, properly charged the jury as to self-defense.
*196 Second, defendant's claim that the jury verdict sheet violated the principles announced in State v. Coyle, supra, by requiring the jury to resolve the issue of guilt or innocence prior to considering insanity is without merit. In State v. Coyle, a capital crime case, our Supreme Court commented on sequential charges, stating:
We need not rule now, however, on either the adequacy of the model charge in general or the merits of sequential charges in all cases. To be sure, a number of jurisdictions condone the use of "acquittal first" deliberations. See United States v. Harvey, 701 F.2d 800, 806 (9th Cir.1983); United States v. Moccia, 681 F.2d 61, 64 (1st Cir.1982); Pharr v. Israel, 629 F.2d 1278, 1281-82 (7th Cir.1980), cert. denied, 449 U.S. 1088, 101 S.Ct. 880, 66 L.Ed.2d 815 (1981); State v. Wussler, 139 Ariz. 428, 679 P.2d 74 (1984); People v. Padilla, 638 P.2d 15, 18 (Colo. 1981); People v. Boettcher, 118 A.D.2d 65, 76, 503 N.Y.S.2d 810, 813-15 (App.Div. 1986), aff'd, 69 N.Y.2d 174, 513 N.Y.S.2d 83, 505 N.E.2d 594 (1987). Juries are consistently told not to consider the lesser-included offenses unless they first find the defendant not guilty of the greater offense. See, e.g., State v. McAllister, 211 N.J. Super. 355, 511 A.2d 1216 (App.Div. 1986) (discussing jury-verdict sheet). There is nothing inherently wrong with a sequential charge. State v. Zola, 112 N.J. 384, 405-06, 548 A.2d 1022 (1988). Such charges assure that a jury renders "a just verdict by applying the facts to the law as it is charged." Ibid. (quoting People v. Boettcher, supra, 69 N.Y.2d at 183, 513 N.Y.S.2d at 87, 505 N.E.2d at 597). Indeed, there is nothing inherently wrong with the model charge for purposeful murder. Absent evidence of passion/provocation, sequential charges usually provide a framework for orderly deliberations. State v. Zola, supra, 112 N.J. at 405, 548 A.2d 1022. [119 N.J. at 223, 574 A.2d 951].
The Coyle court found, however, that "a sequential charge coupled with an instruction that inadequately defines the elements of the greater offense" can mislead the jury. Id. at 224, 574 A.2d 951.
Prior to State v. Coyle, supra, three New Jersey cases dealt generally with the issue of sequential jury charges. See State v. Zola, 112 N.J. 384, 405-06, 548 A.2d 1022 (1988), cert. denied sub nom Zola v. New Jersey, 489 U.S. 1022, 109 S.Ct. 1146, 103 L.Ed.2d 205 (1989); State v. Lewis, 223 N.J. Super. 145, 149-50, 538 A.2d 399 (App.Div.), certif. denied, 111 N.J. 584, 546 A.2d 510 (1988), and State v. McAllister, 211 N.J. Super. 355, 362-63, 511 A.2d 1216 (App.Div. 1986). State v. Zola, supra, involved a homicide where defendant was found guilty of murder, among other crimes. The defendant's claim on appeal was that the *197 illogical placement of a diminished capacity charge and other language deprived the jury of the opportunity to consider the lesser included offenses. The Supreme Court found that "[t]he suggested order of deliberation given to juries by courts, although an understandable exercise in jury management, inevitably raises such questions" as the one on appeal. 112 N.J. at 404-05, 548 A.2d 1022. The Zola court found that "the [trial] court intended to convey no more than the principle that the jury should not be required to enter verdicts on lesser-included offenses when they have found guilt of greater offenses." Id. at 405, 548 A.2d 1022. The Zola court went on, after explaining how the trial court charged the jury and how the verdict sheet structured the jury deliberations, stating:
This concept of sequential resolution of available verdicts poses its own internal problems. See People v. Boettcher, 69 N.Y.2d 174, 513 N.Y.S.2d 83, 505 N.E.2d 594 (1987) (juries should not be permitted to consider lesser included offenses until after they have unanimously found defendant not guilty of the greater crime). The premise is "that it is the duty of the jury not to reach compromise verdicts based on sympathy for the defendant or to appease holdouts, but to render a just verdict by applying the facts to the law as it is charged." Boettcher, supra, 69 N.Y.2d at 183, 513 N.Y.S.2d at 87, 505 N.E.2d at 597. But in advancing that premise care must be taken to avoid the stratification of thought that would deter a jury from returning the proper available verdict. [Id. 112 N.J. at 406, 548 A.2d 1022 (emphasis added)].
In State v. Lewis, supra, defendant was convicted of first degree aggravated manslaughter, second degree aggravated arson, six counts of second degree aggravated assault and one count of second degree burglary. Defendant appealed, challenging the pattern of the trial court's jury instructions. The trial court had charged the jury:
Now, if you find the defendant guilty of murder and/or felony murder, go no further as far as Counts 1 and 2 are concerned. However, if you have found the defendant not guilty of murder and felony murder, you must consider the lesser included offense of aggravated manslaughter.
* * * * * * * *
Now, if you find the defendant guilty of aggravated manslaughter, go no further as far as Counts 1 and 2 are concerned. However, if you find the defendant not guilty of aggravated manslaughter, you must consider the lesser included offenses of reckless manslaughter and a knowing or purposeful killing *198 committed in the heat of passion resulting from a reasonable provocation. [Id. 223 N.J. Super. at 149, 538 A.2d 399].
Defendant asserted "that these instructions unfairly focused the jury's deliberations upon the greater offense of murder." Id. We rejected defendant's contention, noting that defendant was not found guilty of murder, and concluded that:
"[w]here one offense is a lesser included offense, .. . the jury be instructed not to return a verdict on the lesser offense if it finds the defendant guilty of the greater one." State v. McAllister, 211 N.J. Super. 355, 365 [511 A.2d 1216] (App.Div. 1986). See also United States v. Tsanas, 572 F.2d 340, 344 (2d Cir.1978) cert. den. 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); United States v. Butler, 455 F.2d 1338, 1340 (D.C. Cir.1971). See Model Jury Charge (Criminal), sec. 2.223 (1979). [Id. at 150, 538 A.2d 399].
State v. McAllister, supra, involved the propriety of special interrogatories in jury deliberations and the proper instructions when a greater offense and a lesser-included offense go to a jury for deliberations. We held that "the jury should be instructed not to return a verdict on the lesser offense if it finds the defendant guilty of the greater one." 211 N.J. Super. at 365, 511 A.2d 1216.
Clearly, no principle was violated by requiring the jury in this case to first determine guilt or innocence of the crimes charged and then to consider the issue of insanity.

III.
Defendant claims for the first time on appeal that the trial court abused its discretion by allowing the State's expert, Dr. Trent, to testify without holding a Rule 8 hearing to determine the extent of his reliance upon the reports of two defense experts who were not called to testify, Drs. Kern and Schlesinger. We disagree. Defendant has not shown that the trial court's failure to hold a Rule 8 hearing in any way produced an unjust result. Dr. Trent's testimony was based upon his two interviews with defendant and his review of files. No testimony was elicited concerning the reports made by Drs. Kern or Schlesinger.
*199 Beyond this, even if the trial court erred in not holding a Rule 8 concerning Dr. Trent's knowledge and the basis of that knowledge, it is clear that in view of the overwhelming evidence of guilt the error was harmless. The failure to hold a Rule 8 hearing before allowing Dr. Trent to testify was not "clearly capable of producing an unjust result." See R. 2:10-2; State v. Lair, supra, State v. Hock, supra. No real possibility exists that the claimed error led the jury to a result that it otherwise might not have reached. See State v. Macon, supra.

IV.
Defendant also contends for the first time on appeal that the trial court's jury charge for purposeful murder was deficient in its failure to address the proper role of passion/provocation evidence. We disagree. The charge read as a whole accurately set forth the applicable law controlling this case, including the law as to murder and passion/provocation manslaughter. The trial court correctly instructed the jury on the relationship between a purposeful and knowing murder and a homicide committed in the heat of passion and provocation. Contrary to defendant's argument, the trial court made it abundantly clear that if the jury found that defendant acted purposely or knowingly it was required to consider heat of passion and provocation before it could determine whether the crime was murder or manslaughter. This is essentially what is required by State v. Coyle, supra.
In State v. Coyle, our Supreme Court reversed defendant's conviction where the sequence of jury charges could have potentially allowed the jury to convict defendant of murder without having considered the possibility of a manslaughter verdict. The Court held that the complete charge for murder must include an instruction that the jury must find the State has disproven passion/provocation beyond a reasonable doubt if any evidence of passion/provocation appears in the record. 119 N.J. at 221, 574 A.2d 951. The trial court had erred by first *200 charging the definition of murder with no mention of the State's need to disprove passion/provocation if there was such evidence in the record, then giving a passion/provocation manslaughter charge which first instructed the jury that it need not consider either aggravated manslaughter or manslaughter unless the State had failed to prove murder beyond a reasonable doubt, then only later charged that if passion/provocation was in evidence, that the State must disprove it beyond a reasonable doubt. Id. at 222, 574 A.2d 951. The overall charge, the Court held,
had the potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter. Thus, despite the evidence of passion/provocation in the record, the jury may have convicted defendant of murder simply by finding that "it [was] his conscious object to cause death or serious bodily injury," without having considered the possibility of a manslaughter verdict. [Id. at 222-23, 574 A.2d 951].
More recently, our Supreme Court reversed a conviction in State v. Erazo, 126 N.J. 112, 121, 594 A.2d 232 (1991), where the trial court refused to give a charge that the State bore the burden of disproving passion/provocation, even though it was warranted by the evidence. The actual charge both placed the burden of proving passion/provocation on defendant and lacked "the muscle to shift to the State the burden to disprove passion/provocation." Id. at 122, 594 A.2d 232. The trial court's error was aggravated by its further charge that the jury "should first consider whether defendant was guilty of murder and that if it acquitted defendant of that offense, it should then consider the manslaughter charge." Id. at 125, 594 A.2d 232. The Supreme Court found two problems with this later charge: first, that its sequence may have foreclosed consideration of passion/provocation during consideration of the murder charge; and second, that the charge was backwards, because the instruction as given would have let the jury find passion/provocation manslaughter only if it first acquitted defendant of murder, and ignored the fact that passion/provocation manslaughter may only be found if the elements of knowing or purposeful *201 murder are found and passion/provocation is present to reduce the charge to manslaughter. Id. at 125-26, 594 A.2d 232.
None of the charging errors found reversible in Erazo and Coyle are present here. As the Court noted in Coyle, all that is required is that "[i]f there is sufficient evidence of passion/provocation, a trial court must instruct the jury that `to find murder it must be convinced beyond a reasonable doubt that the accused did not kill in the heat of passion * * *." 119 N.J. at 221-22, 574 A.2d 951; quoting State v. Grunow, 102 N.J. 133, 145, 506 A.2d 708 (1986). The trial court's charge here essentially accomplished that purpose. The trial court instructed the jury that "as to this charge of murder, knowing or purposeful murder, there is  and to this charge only, there is another crime called manslaughter based on passion and provocation which you may decide to consider." [Emphasis supplied]. After defining the term "provocation" for the jury, the trial court charged:
If you are not satisfied beyond a reasonable doubt that the State has proven that the defendant did, in fact, cause the victim's death or that defendant acted purposely or knowingly, then you must find the defendant not guilty of murder.
If you are satisfied beyond a reasonable doubt that the elements of murder have been proved, but have a reasonable doubt as to whether the State has proven that defendant did not act under the stress of reasonable provocation, you must find the defendant not guilty of murder and find him guilty of provocation, passion, manslaughter.

If you are convinced beyond a reasonable doubt that the State proved that the defendant knowingly or purposely caused death or serious bodily injury resulting in death without acting in the heat of passion upon reasonable provocation, then you must find the defendant guilty of murder. [Emphasis supplied].
A fair reading of this charge leads to the conclusion that the charge reasonably informed the jury that the State had to prove that defendant did not kill in the heat of passion. State v. Erazo, 126 N.J. at 122, 594 A.2d 232; State v. Coyle, 119 N.J. at 222, 574 A.2d 951.

V.
The State concedes that the trial court erred in charging the jury to consider the intoxication testimony with respect *202 to aggravated manslaughter and manslaughter. However, the trial court's error with respect to this limited aspect of the charge was harmless beyond a reasonable doubt. The error was not "clearly capable of producing an unjust result." See R. 2:10-2; State v. Lair, supra; State v. Hock, supra. There was no real possibility that they led the jury to a result that it otherwise might not have reached. See State v. Macon, supra.

VI.
Finally, defendant contends that his sentence was manifestly excessive, and urges us to modify the sentence to 30 years with a 30-year period of parole ineligibility or to remand the matter for resentencing. We are satisfied that the sentence imposed was neither illegal nor excessive. Moreover, careful review of the record shows that, contrary to defendant's claim, the sentence complies with the provisions of the New Jersey Code of Criminal Justice and resulted from the trial court's thorough analysis and careful weighing of the relevant aggravating and mitigating factors. The trial court found that the aggravating factors substantially outweighed the mitigating factors and imposed a sentence in accordance with law. In our view, the sentence was neither manifestly excessive nor unduly punitive and did not represent a miscarriage of justice or shock the judicial conscience. See State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 387-88, 555 A.2d 553 (1989); State v. Jarbath, 114 N.J. 394, 401, 555 A.2d 559 (1989).
Accordingly, the judgment of conviction and order for commitment under review are affirmed without prejudice to the right of defendant to move before the trial court for a new trial based on newly discovered evidence.